FILED

# UNITED STATED DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

# TAMPA DIVISION

|  |  |
|---|---|
| ERIC GEROW, | Case No.: **8:22-CV-2977-SDM-CPT** |
|      Plaintiff, | |
| vs. | |
| U.S. DEPARTMENT OF JUSTICE, CITY | PERMANENT INJUNCTIVE RELIEF |
| OF PHOENIX, PHOENIX POLICE | REQUESTED. DECLATORY RELIEF |
| DEPARTMENT, JEMIMA SCHMIDT, | REQUESTED. DEMAND FOR JURY |
| RYAN JUNAS, DAN SCHNEIDER, | TRIAL. |
| GARY GOMBAR, JUILIAN ROSARIO, | |
| KELLIE MCGHEE, ARIZONA | |
| DEPARTMENT OF PUBLIC SAFETY, | |
| HESTON SILBERT, ANDRES | |
| VASQUEZ, MATTHEW MURRAY, | |
| ARIZONA ATTORNEY GENERALS | |
| OFFICE, MARK BRNOVICH, SHAWN | |
| STEINBERG, TAMMY MILLER, | |

TPA 67830

NICOLE SHAKER, ARIZONA

DEPARTMENT OF

TRANSPORTATION, JOHN

HALIKOWSKI, TIM LANE, BRIAN

ECKENBOY, KEITH RICHARDSON,

JANE OR JOHN DOES 1-100

Defendants, in their personal and

professional capacities

## PLAINTIFF ERIC GEROW'S  COMPLAINT FOR INJUNCTIVE, MONETARY AND DECLARATORY RELIEF

Plaintiff, Eric Gerow, brings this Complaint for Injunctive, Monetary, and Declaratory Relief (the "Complaint") against Defendants, and each of them, as follows:

### JURISDICTION AND VENUE

1.  This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331. The Complaint alleges violations of Constitutional rights guaranteed by the 1st and 14th Amendments of the U.S. Constitution as well as violations of Federal law.

2.  This Court also has diversity of citizenship jurisdiction as Plaintiff enjoys different citizenship than each and all Defendants, and the amount in controversy exceeds the statutory amount pursuant to 28 U.S.C. § 1332.

3.  This Court has jurisdiction over Plaintiff's claims under 5 U.S.C. § 702, "Right of Review."

4.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 as these claims arise from the same common nucleus of operative facts from which the Federal claims arise.

5.  Venue is properly laid under 28 U.S.C. § 1391 (b) (2) and (b) (3) and, in the case of the Federal defendants, 28 U.S.C. § 1391(e)(1).  Venue is properly laid for Federal defendant pursuant to 28 U.S.C. § 1391(e)(1) and the non-Federal defendants are joined as parties under 28 U.S.C. § 1391(e)(1).

## THE PARTIES

6.  Plaintiff Eric Gerow is a U.S. citizen and a resident of the State of Florida.

7.  Concerning Defendants, Plaintiff states on information, knowledge, and belief as follows:

8.  Defendant U.S. Department of Justice is the apex Federal law enforcement agency of the United States.

9.  Defendant City of Phoenix is a charter city in the State of Arizona.

3

10.  Defendant Phoenix Police Department (hereinafter PPD) is the law enforcement agency of the City of Phoenix.

11.  Defendant Jemima Schmidt is an officer of the PPD.

12.  Defendant Ryan Junas is an officer of the PPD.

13.  Defendant Dan Schnieider is an officer of the PPD.

14.  Defendant Gary Gombar is an officer of the PPD.

15.  Defendant Julian Rosario is an officer of the PPD.

16.  Defendant Kellie McGhee is an officer of the PPD.

17.  Defendant Arizona Department of Public Safety (hereinafter DPS) is the State-level law enforcment agency of the State of Arizona.

18.  Defendant Heston Silbert serves as Colonel of the Arizona DPS.

19.  Defendant Andres Vasquez serves as Executive Officer of the Arizona DPS.

20.  Defendant Matthew Murray serves as an officer of the Arizona DPS.

21.  Defendant Arizona Attorney General's Office is the apex law enforcement agency of the State of Arizona.

22.  Defendant Mark Brnovich serves as the Attorney General of the State of Arizona.

23.  Defendant Shawn Steinberg serves as the Section Chief Counsel for Fraud and Special Prosecutions of the Arizona Attorney General's Office.

4

24. Defendant Nicole Shaker serves as an Assistant Attorney General within the Arizona Attorney General's Office.

25. Defendant Arizona Department of Transportation (hereinafter ADOT) is a State agency of the State of Arizona.

26. Defendant John Halikowski serves as the Director of ADOT.

27. Defendant Tim Lane serves as the Director of the Enforcement and Compliance Division of ADOT.

28. Defendant Brian Eckenboy is a Lieutenant with ADOT.

29. Defendant Keith Richardson is an officer with ADOT.

30. Defendants Jane or John Does 1-100 are parties with liability in this Complaint who have not yet been identified.

## INTRODUCTION

31. This is a civil rights lawsuit. All Defendants are public officers, employees, or or agencies responsible for law enforcement.

32. Plaintiff was the victim of serious crime occurring in the jurisdiction of Defendants.

33. Despite having a mandate, responsibility, and sworn obligation to enforce State and Federal law, Defendants refused to assist Plaintiff or enforce the law.

5

34. Not only did Defendants not assist Plaintiff, they actively aided and participated in the theft and fraud against him. They misused their offices to deliberately cause harm to Plaintiff, seemingly out of sheer spite in order to retaliate against Plaintiff.  By doing so Defendants became co-conspirators in the theft and fraud, with direct liability therein.

35. Each Defendant described in paragraphs 8 - 30 who is a natural person has taken an Oath of Office as required by Arizona Revised Statute § 38-231. This Oath requires them to protect the Constitutional rights of citizens, to uphold the laws of the State of Arizona, and to "faithfully and impartially" discharge their duties of office.

36. Each Defendant described in paragraphs 8 - 30 who is a natural person is a public official who receives compensation from the taxpaying public in return for carrying out their duties of office.

37. Each Defendant listed in Paragraphs 8 – 30 whether natural person or agency occupies a position of tremendous public trust.  They are entrusted to operate with integrity and to uphold the law without fear or favoritism. Because of the importance of these duties, tremendous harm can result when that public trust is violated.

38. Law enforcement in Arizona appears to be in crisis, unable or unwilling to perform its core duties.  Defendant Phoenix Police Department

6

(PPD) is currently under an ongoing full-scope investigation by the U.S. Department of Justice (DOJ) for systematic abuses and civil rights violations that have resulted in substantial harm to the public. This DOJ "pattern and practice" investigation is a comprehensive audit by Federal authorities of a local law enforcement agency. It is a rare step reserved for the most seriously deficient police departments that fall far short of public standards.

39.  The Maricopa County Sherrif's Department (MCSC) is also under Federal judicial supervision due to egregious shortfalls in its policing and internal affairs practices. A Federal judge has ordered the MCSC to pay $1.15 million in fines per month until these "knowing and continuous" shortfalls are remedied.

### ALLEGATIONS

40.  Plaintiff realleges and incorporates by reference paragraphs 1 to 38.

41.  Plaintiff sets forth the following facts and allegations based on information, knowledge, and belief. The facts and allegations set forth herein are relevant and common to all Causes of Action in this Complaint.

42.  In February 2018, Plaintiff purchased a vehicle and contracted with Blackwell Automotive located at 15440 N. 40th Street, Phoenix Arizona to have work done on the vehicle. Plaintiff paid Blackwell Automotive $15,000 up front for work to be performed, and deposited the vehicle with Blackwell.

7

43.  No work was performed. The vehicle sat for two and a half years apparently untouched. During this time, Blackwell did not contact Plaintiff or provide any evidence that work had been performed such as updates, photos, or receipts for items allegedly purchased for any work done.  Blackwell essentially went "radio silent" for two and one-half years.

44.  When contacted by Plaintiff periodically during this time, Blackwell offered vague excuses for why the work had not been done, yet still did not perform the work or complete the project.

45.  By June of 2020, Blackwell had kept Plaintiff's vehicle for two and a half years.  Plaintiff politely asked Blackwell for the work to finally be completed.  In an email exchange, proprietor Tom Blackwell apologized to Plaintiff for the lack of activity and admitted to Plaintiff in an email that he had "totally taken advantage of (Plaintiff)." Blackwell set a firm date of 7/21/20 to complete the work. The email from Tom Blackwell to Plaintiff dated 6/13/2020 stated:

> "You are completely correct everything you've spoken about. I've totally
>
> taken advantage of you and I apologize. I'll make every effort to get on top
>
> of the project Monday/Tuesday and get you as firm at date as possible.
>
> Again, I apologize.
>
> Regards,

Tom"

46. In a subsequent email to Plaintiff, Tom Blackwell confirmed a firm date to have all work completed. In an email dated 6/17/20 Blackwell stated:

"I'll have it completed and ready to roll 7-31-2020.....!!! All will be good...

Thanks

Tom"

47. Plaintiff immediately double-checked with Blackwell that all work would be completed by 7/31/20, asking for confirmation that it was the final, conclusive date. In a subsequent email Blackwell stated:

"Yes on the final date, and look forward to catching up as well.

Thanks

Tom"

The date 7/31/2020 date came and went with nothing done.

48. At this point Plaintiff had waited patiently for two and a half years for the work he had paid to be performed to be completed. It had not, despite multiple promises to do so. Plaintiff finally asked Blackwell for the return of his money and his vehicle.

49. In the subsequent email exchange, Tom Blackwell stated that he would keep the money and the vehicle, unless Plaintiff immediately paid some $30,000

in cash only, for imaginary "storage charges" that Blackwell had decided to begin levying at $125 per day, beginning after Plaintiff asked for his money and vehicle to be returned. The notice of new "storage charges" came out of the blue. The vehicle had been sitting idle for two and a half years, long enough to be seen on Google satellite maps. There was no basis in law, contract, or agreement for the alleged new "storage charges" at the outrageous amount of $125 per day that Blackwell now threatened to unilaterally begin imposing. Blackwell demanded the nearly $30,000 be paid in cash. Plaintiff believes that Blackwell attempted to use the pretext of bogus "storage charges" to extort additional funds out of Plaintiff, and that Plaintiff's vehicle would never have been returned to him regardless of what he did or paid, similar to a ransom situation.

50. Plaintiff believes, and the fact pattern indicates, that Blackwell's intent all along was to defraud Plaintiff of his vehicle and his money. Because Plaintiff was located out of state, Plaintiff believes, and the fact pattern indicates, that Blackwell saw an opportunity to deprive Plaintiff of his vehicle and funds by simply delaying work indefinitely with the goal of ultimately seizing control of the vehicle that had been placed in his care. Plaintiff believes, and the fact pattern indicates, that Blackwell may have seen Plaintiff, who was a trusting and unsuspecting client from out of state, as an easy mark for taking both his vehicle and his money using skilled fraud techniques.

51.  No legitimate auto repair shop would keep a vehicle for two and a half years, going "radio silent" with the owner, unless there was an ulterior motive. Plaintiff believes, and the fact pattern indicates, that Blackwell believed that the more time that passed, the more likely Blackwell would be to successfully seize control of Plaintiff's vehicle and money.  As the years went by, perhaps Plaintiff would have a change in life circumstances that would preclude him from retrieving his property.  Perhaps Plaintiff would become ill, or move overseas, or forget about his vehicle, or lose the will to fight to get it back, or even die.  Time was on Blackwell's side; the longer Blackwell kept control of the vehicle, the less likely Plaintiff would be able to get his property back.

52.  After Plaintiff demanded the return of his vehicle and his funds in July 2020,  Blackwell transported the vehicle to an unknown location outside of his business premises. The vehicle had sat at his business premises for two and a half years without being touched.  But when Plaintiff requested the return of his vehicle and money, the vehicle was suddenly moved by Blackwell to a location unknown to Plaintiff, presumably in order to hide the vehicle from Plaintiff and make any recovery effort difficult.

53.  Other customers of Blackwell Automotive reported similar abusive experiences.  Review sites such as Yelp and Google Reviews contain multiple allegations of fraud, overbilling, and even violence.  One user alleged an incident

wherein he had to call the Phoenix Police Department (a defendant in this Complaint) to Blackwell Automotive to have his vehicle returned after being defrauded, and to provide safety from an "angry, aggressive, and vindictive" Tom Blackwell where he feared for his safety. This customer claimed that when police arrived, Tom Blackwell was in the act of cutting parts off his car. This user also posted photos of the police visiting Blackwell Automotive in this tense encounter. The complete review from "Joshua A" of Camelback Village posted to Yelp on 9/17/21 states:

> "Stay away from these crooks. Tom Blackwell is the most unprofessional, unethical, and crooked automotive shop owner. I dropped my car off for an estimate and it took him a month to take a look at it and once he did he provided me no estimate for work or even a ballpark cost. He called me after a month and said he will look at it next week and give me a call once he's looked it over. A few days later i get a call from him telling me it's ready to be picked up. I asked him how much and what was done and he said he didn't know and for me to just come in and go over it. I get there and it's a $2000 bill!!! For a 1971 Pinto i needed to sell which i told him up front. He provided no estimate for work and i had to call the police to get my car released. He then started cutting out parts from the car and told me he would "take the f***ing tires off and I'll have to get a flatbed to get it out

of here." He then pushed the car into the street and left it there. Luckily the cops pulled up as he was doing that. Very angry, aggressive, vindictive person. I was scared and relieved when the police showed up."

54. Other customer Yelp reviews contained similar allegations of fraud and also alluded to physical violence by Blackwell directed at customers who had complained about being defrauded. On 2/23/16 Yelp user "Chase P." reported being subjected to violence at Blackwell Automotive:

"Rude, unprofessional and disrespectful. If you want to get ripped off and treated disrespectfully come here. When I talked with the owner she didn't give me any answers for my questions and was rude like hell, she simply kicked me out of her place violently."

55. Plaintiff was informed by Phoenix Police Department administrative staff that other calls to the police had been made from Blackwell Automotive, to include emergency 911 calls and/or hangup 911 calls, in addition to the police response detailed in Paragraph 52.

56. It became clear to Plaintiff that he had been victim of fraud, auto theft, and other related crimes. Plaintiff reported this incident to law enforcement agencies in the State of Arizona with jurisdiction over the matter.

57. Because of the online reports of violence and intimidation of customers at Blackwell Automotive, combined with reports of police responses to and 911 emergency calls from the Blackwell Automotive location, Plaintiff was understandably concerned for his physical safety when dealing with Blackwell Automotive. Plaintiff had a credible fear that he may become the victim of violence, should he venture to Blackwell's business premises or even potentially at his own home should he be retaliated against.

58. The alleged scheme by Blackwell to deprive Plaintiff of his funds and vehicle constituted several violations of the Arizona Revised Statutes including ARS § 13-2310, "Fraudulent Schemes and Artifices," ARS § 13-1814, "Theft of Means of Transportation," ARS § 13-1802, "Theft," and other possible criminal violations relating to conversion of property. These statutes fall within the jurisdiction of Defendants to enforce.

59. Many of the other online reports of alleged fraud at Blackwell Automotive would also constitute violations of ARS § 13-2310, "Fraudulent Schemes and Artifices," and related statutes, should they be proven. These reports alleged significant overbilling, billing for work not allegedly performed, and alleged fraud rising to thousands of dollars per incident. They were reported by numerous separate victims reporting independently of each other. Many were reported with specific details such as dates, vehicle types, and the specific work

14

in question. The information contained enough specificity to allow the complaints to be investigated by authorities, had they been so inclined.

60. Defendants refused to investigate Plaintiff's complaint despite clear evidence of wrongdoing and corroborating reports of similar mistreatment from other victims that would lend credibility to Plaintiff's complaint.

61. Had Defendants acted in a timely fashion to investigate Plaintiff's complaint, other victims who are members of the public could have potentially been spared. Harm that was documented in subsequent online reviews alleging abusive treatment by this establishment could have been prevented.

62. Plaintiff endured the frustrating experience of dealing with a law enforcement bureaucracy that couldn't care less. Arizona law enforcement was uncaring and almost inhuman in its indifference to victims of crime. Arizona law enforcement seemed characterized by a culture of arrogance, indifference, and unaccountability, where citizens were viewed as a nuisance. Plaintiff contacted numerous agencies in Arizona at the State, County, and local level for assistance, including the City of Phoenix. Plaintiff was "given the run around" and told to call other agencies, or simply ignored.

63. Defendant Dan Schneider is a detective with the Phoenix Police Department and was the officer assigned to Plaintiff's complaint. Detective Schneider never even spoke with Plaintiff or communicated with him in any

fashion, such as email, before closing out the complaint.  Detective Schneider was unreachable by Plaintiff. Detective Schneider's voicemail message indicated that he was too busy to receive phone calls, and requested callers to send an email to an address left on the voicemail instead of calling.  Plaintiff dutifully sent an email to this address, requesting to speak to Detective Schneider, but never did speak with him.  It is unthinkable that an officer responsible for investigating a case would close it out without even speaking to the complainant.

64. After Plaintiff complained multiple times about the lack of action from the Phoenix Police Department, that agency did send a detective to Blackwell Automotive. However, that officer, Detective Gary Gombar, did no investigation worthy of the name. He appeared to merely have a chat with Tom Blackwell. Fraud, auto theft, and related crimes are felony-level violations of the Arizona Revised Statutes warranting serious investigation.  Despite this, Detective Gombar did no serious investigation. He did not interview any other member of Blackwell staff who would have had first-hand knowledge of what actually transpired.  Detective Gombar did not conduct research into documents, receipts, time sheets, or use other standard investigative techniques to determine what had actually happened.  It appears Officer Gombar's visit was merely a "CYA" visit to generate the superficial appearance of action after Plaintiff had complained for weeks of inaction.

65.  The offfice of Arizona Attorney General Mark Brnovich also refused to investigate the matter, despite listing auto theft and fraud by auto dealers and mechanics as one of the top crimes in the State of Arizona.  During interactions with the staff of Attorney General Brnovich, it was indicated to Plaintiff that Attorney General Brnovich preferred to take high-profile cases that had the potential to generate positive press coverage for AG Brnovich, presumably because the position of Attorney General is an elected office and AG Brnovich's political career benefits from positive press coverage.

66.  All of the Defendants who are law enforcement agencies have vast powers and resources to investigate wrongdoing. They are funded generously by the taxpayer to carry out this mandate.  They have large staffs of sworn officers, civilian employees, attorneys, and investigators.  The investigative techniques available to them include civil and criminal investigations, inquiries, subpoenas, consumer protection operations with undercover vehicles and officers, and many more techniques. They could have easily chosen to assist Plaintiff and others similarly situated.

67.  The Arizona Department of Public Safety (DPS) also has a core manadate to investigate and proscute auto-related crimes in the State of Arizona. The DPS administers the Arizona Vehicle Theft Task Force (AVTTF) also known as "RATTLER" (Regional Auto Theft Team Law Enforcement Response) . The

DPS has tremendous resources, both direct and inter-agency, at its disposal. The DPS refused to assist Plaintiff or investigate his complaint.

68. Instead of investigating Plaintiff's legitimate complaint, DPS actually threatened Plaintiff. When Plaintiff attempted to make a complaint about DPS inaction, an officer from DPS began interrogating Plaintiff in a rapid fire, abusive manner with "yes or no" questions that often contradicted each other, in a fashion reminiscent of a military drill instructor. This rapid fire questioning was not intended for any legitimate investigative purpose, but was meant solely to harass and intimidate Plaintiff and deliberately trip him up. When this DPS officer believed he had tripped up Plaintiff with his rapid fire, aggressive questioning, this DPS officer immediately threatened to charge Plaintiff with "making a false statement," despite Plaintiff not having done so. The episode was humiliating and degrading for Plaintiff. It was designed to strike fear into Plaintiff under color of law in order to silence Plaintiff and prevent him from filing and pursuing his legitimate complaint, in violation of his fundamental Constitutional rights.

69. When Plaintiff asked Blackwell for his vehicle to be returned, Plaintiff's vehicle was moved to an unknown location by Blackwell, apparently in order to thwart any attempt by Plaintiff to recover his property. When Plaintiff learned that the vehicle had been moved to an unknown location, Plaintiff reported this

to the Phoenix Police Department as a development in his initial complaint. Phoenix Police Officer Julian Rosario learned the location of the vehicle and visited it. Despite knowing the location of Plaintiff's vehicle, Officer Rosario refused to share the location of Plaintiff's vehicle with Plaintiff. Plaintiff made multiple requsests to Officer Rosario and other members of the Phoenix Police Department to reveal the location of his misappropriated vehicle, but they refused. By failing to reveal the location of Plaintiff's vehicle, Officer Rosario and the Phoenix Police Department became an active participant, accessory, and conspirator in the theft, concealment, and misappropriation of Plaintiff's property.

70. Plaintiff also attempted to communicate with the Arizona Department of Transportation (ADOT) to prevent any fraudulent lien or transfer of title of his vehicle. Tom Blackwell had threatened to file a lien on the vehicle and obtain a new title for it unless his new demand for nearly $30,000 in bogus "storage fees" accruing at $125 per day was paid in cash. Plaintiff realized he was up against a very sophisticated and experienced operator, and Plaintiff needed the assistance of ADOT in preventing the fraudulent placement of a lien or transfer of title of his vehicle. There are numerous ways that a title can be fraudulently transferred or a lien fraudulently placed, often with very little supporting documentation. The filing of a fraudulent lien is a crime under the Arizona Revised Statutes.

71. ADOT refused to provide any assistance or guidance to Plaintiff. ADOT even refused to flag the case in their computer system, should an attempt to fraudulently transfer title or other action be taken in the future.

72. When Plaintiff again requested that ADOT prevent the fraudulent transfer of his title, ADOT officers became outright hostile and abusive to Plaintiff. ADOT law enforcement officer Keith Richardson even went out of his way to try to make Plaintiff's situation worse. In a telephone conversation with Defendant Keith Richardson, instead of displaying a professional demeanor and concern for the situation befitting a sworn officer, Officer Richardson repeatedly laughed at Plaintiff in a loud, theatrical, screeching laugh designed to humiliate and mock Plaintiff, and belittle Plaintiff's legitimate concerns. Defendant Richardson's loud, screeching, intentionally degrading laugh was reminiscent of junior high school, not the conduct of a sworn peace officer. Soon thereafter, despite having no legal mandate to do so, Officer Richardson took it upon himself to seek out and contact a previous owner of Plaintiff's vehicle and attempt to convince that person to file an official claim on the vehicle as well, just to make things difficult for Plaintiff. Officer Richardson seemed to do this for the sheer sadistic pleasure of making Plaintiff's life more difficult and to "teach him a lesson." Officer Richardson seemed to gloat afterwards that he had made Plaintiff's situation worse, not better. In doing so, Officer Richardson not only

20

violated his Oath of Office and professional standards.  He may also have

committed violations of the Arizona Revised Statutes including suborning

perjury and aiding and abetting auto theft, and related Federal statutes to the

extent this conduct occurred across State lines.

73.  During the period when Plaintiff was attempting to file a complaint

with the Phoenix Police Department (PPD), the U.S. Department of Justice (DOJ)

announced that it was launching an widespread investigation into abuses and

malfeasance at the PPD. The DOJ issued a public notice requesting that anyone

who was the victim of PPD misconduct contact them and report their experience.

Plaintiff did so.

74.  When Plaintiff reported his experience with the PPD to the DOJ, he

was relieved. He believed that finally action was being taken by the Federal

government to remedy this unprofessional and out of control agency that had

caused so much harm to him and others.  However, despite being aware of

systematic abuses by the PPD and actively investigating them at the time, and

despite having requested the public to report such abuses, the DOJ took no

action on Plaintiff's complaint other than to confirm receiving it.

75.  Plaintiff was clearly the victim of activity by Blackwell that violated

the Arizona Revised Statutes related to fraud and theft.  Plaintiff deposited his

vehicle and his money with Blackwell, waited two and a half years, and lost

21

both.  Other customers also reported on Yelp being victims of what they believe to be criminal activity by Blackwell. They used terms like "crook," "crooked," "ripoff artists at their finest," "ripped off," "totally ripped me off," "rip-off joint," "they rape you," and similar language to express what happened to them.

76.  Despite the preponderance of evidence from Plaintiff and others indicating likely criminal activity in violation of the Arizona Revised Statutes, Defendants told Plaintiff that the matter was "civil, not criminal." They said this without basis in fact or legal justification. Defendants did this because declaring the matter civil rather than criminal would give them an excuse to not do anything.  Their caseload would decrease, they would not have to do any extra work, and yet their pay would remain the same.

77.  The threshold for establishing criminal liability in the State of Arizona are set forth in ARS §13-201. This statute states:

"Arizona Revised Statute §13-201: Requirements for criminal liability: The minimum requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform a duty imposed by law which the person is physically capable of performing."

The conduct Plaintiff was subjected to meets the ARS §13-201 standard of criminal behavior in violation of Arizona fraud and theft statutes. It also meets the common law and common sense test. Defendants knew, or had an obligation to know the standard of ARS §13-201, yet they ignored it.

78.  Plaintiff believes that if any of the Defendants had been subjected to the same conduct as Plaintiff suffered, an investigation would have commenced immediately. If an auto shop had kept the vehicle and funds belonging to the Phoenix Police Department or Arizona Department of Public Safety or Arizona Attorney General for two and a half years, ultimately returning neither vehicle nor money, action would have been swiftly taken.

79.  Defendant Assistant Attorney General Nicole Shaker incorrectly claimed the matter was civil rather than criminal before even speaking with Plaintiff.  After numerous requests from Plaintiff to speak with someone in the Arizona Attorney Generals' Office, Defendant Assistant Attorney General Nicole Shaker reluctantly endured a brief "courtesy call" with Plaintiff.  During this brief call, Defendant Shaker hardly said a single word and did not ask a single question.  She did not inquire, proble, investigate, or seek out information to determine the facts as a public prosecutor should do. She merely waited for Plaintiff to stop speaking and then brusquely informed Plaintiff of her foregone conclusion.

80. Ironically, Defendant Shaker had recently publicly commented on the impossibility of seeking justice from sophisticated fraudsters in civil court. In an online article in the Albuquerque Journal dated 4/8/21, Defendant Shaker spoke about a fraud trial she was then prosecuting. Defendant Shaker was quoted as follows:

> "At (defendant) Rodrick's first court hearing, prosecutor Nicole Shaker said Rodrick has a separate $3 million civil judgment against him in Maricopa County for the victims in the criminal case, yet he hasn't paid them anything. Shaker said Rodrick uses limited liability corporations and girlfriends to hide his assets."

81. The current wherabouts of Plaintiff's vehicle is unknown. The substantial money he paid Blackwell up front is still missing. The deliberate acts and omissions of the Defendants caused Plaintiff substantial harm that is ongoing today.

82. Each Defendant owed a duty of care to Plaintiff by virtue of the extensive authorities, duties, and responsibilities conferred to them by law. Each Defendant who is a natural person swore an oath to uphold the law. Each Defendant received significant compensation from the public in return for carrying out their duties of office. Each Defendant was made aware of the

Plaintiff's legitimate complaints numerous times, but took no action. Each defendant knew, or should have known, of the legal standard for criminal liability set forth in Arizona Revised Statute §13-201 and common law.

83.   In some cases Defendants took it upon themselves to take steps to deliberately harm Plaintiff, acting with intentional and deliberate malice in order to "punish" Plaintiff for not dropping the matter.  Each Defendant shirked their legal duty and professional responsibilities for matters within their direct control, thereby knowingly and intentionally causing substantial harm to Plaintiff, and treated Plaintiff differently than other parties similarly situated.

## FIRST CAUSE OF ACTION

### Violation of 1ˢᵗ Amendment Rights: Freedom of Speech

84.   Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

85.   Plaintiff alleges that his right to freedom of speech as guaranteed by the 1ˢᵗ Amendment of the United States Constitution was violated by Defendants, acting individually and collectively.

## SECOND CAUSE OF ACTION

### Violation of 1st Amendment Rights: Freedom to Petition

86. Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

87. Plaintiff alleges that his right to petition his government for redress of grievances as guaranteed by the 1st Amendment of the United States Constitution was violated by Defendants, acting individually and collectively.

## THIRD CAUSE OF ACTION

### Violation of 14th Amendment Rights: Equal Treament under the law

88. Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

89. Plaintiff alleges that his right to equal treatment under the law guaranteed by the 14th Amendment of the United States Constitution was violated by Defendants, acting individually and collectively, and that Plaintiff was not provided assistance routinely afforded to similarly situated parties.

## FOURTH CAUSE OF ACTION

### Violation of 14th Amendment Rights: Equal Protection

90.  Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

91.  Plaintiff alleges that his right to due process and equal protection under the law as guaranteed by the 14th Amendment of the United States Constitution was violated by Defendants, acting individually and collectively.

## FIFTH CAUSE OF ACTION

### Violation of Civil Rights Act of 1871; 42 U.S.C. § 1983 et seq. ("Deprivation of Rights")

92.  Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

93.  Plaintiff alleges that Defendants deprived him of his "rights, privileges, and immunities secured by the Constitution and laws" as described in the Civil Rights Act of 1871; 42 U.S.C. § 1983 et seq.

## SIXTH CAUSE OF ACTION

### Violation of 18 U.S.C. § 241 et seq. ("Conspiracy against Rights")

94.  Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

95. Plaintiff alleges that Defendants acting indivdually and collectively conspired to deprive Plaintiff of "the free exercise of any right or privilege secured to him by the Consitution or laws of the United States" and thereby Defendants did engage in a "Conspiracy against Rights" in violation of Plaintiff's rights as defined in 18 U.S.C. § 241 et. seq.

## SEVENTH CAUSE OF ACTION

### Violation of 18 U.S.C. § 242 et seq. ("Deprivation of rights under color of law")

96. Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

97. Plaintiff alleges that Defendants subjected Plaintiff to "deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States" and that such deprivation was done "under color of any law, statute, ordinance, regulation, or custom" in violation of 18 U.S.C. § 242 et seq.

## EIGHTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

98. Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

28

99.  Plaintiff alleges Defendants subjected him to intentional infliction of emotional distress, with this Court having supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## NINTH CAUSE OF ACTION

### Theft

100.  Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

101. Plaintiff alleges Defendants committed, aided, and abetted theft against him, with this Court having supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## TENTH CAUSE OF ACTION

### Fraud

102.  Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

103.  Plaintiff alleges Defendants committed, aided, and abetted fraud upon him, with this Court having supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## ELEVENTH CAUSE OF ACTION

### Negligence

104.  Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

105.  Plaintiff alleges Defendants acted with negligence towards Plaintiff in a manner lacking prudent care as would be reasonably expected and commensurate with the duty of care owed to him, thereby causing Plaintiff substintial harm, with this Court having supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## TWELFTH CAUSE OF ACTION

### Claim on Surety Bonds

106.  Arizona Revised Statutes § 38-251 requires every public official in the State of Arizona to maintain a surety bond in the amount of $100,000 "for each state officer and employee conditioned on the faithful performance of his duties."

107.  Arizona Revised Statute § 38-260 further states:

"Every official bond executed by any officer pursuant to law, is in force and obligatory upon the principal and sureties therein to and for the state and to and for the use and benefit of all persons who may be injured or aggrieved by the wrongful act or default of the officer in his official

capacity. Any person so injured or aggrieved may bring an action on the bond in his own name without an assignment thereof."

Plaintiff is a "person so injured or aggrieved" within the meaning of ARS § 38-260 by the failure of Defendants to faithfully perform their duties as described by ARS § 38-251 and also the by the "wrongful act or default of the officer in his official capacity" as described by ARS § 38-260.  Plaintiff is entitled "to bring an action on the bond is his own name without an assignment thereof" pursuant to ARS § 38-260.

108.  For each Defendant in paragraphs 8 - 30 who is a natural person and surety bonded as mandated by ARS § 38-260, Plaintiff hereby brings action to claim the full amount of each surety bond, for each and every Defendant, individually and separately, with this Court having supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, and also noting that no venue or jurisdictional requirement is specified in ARS § 38-260.

## THIRTEENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 et seq. ("Monell Violation")

109. Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

110. Plaintiff alleges that Defendants in their official capacity acted with deliberate indifference to the rights of Plaintiff and others so similarly situated, and that Defendants tolerated, permitted, failed to correct, promoted, or ratified a number of official customs, patterns, or practices that violated the rights of Plaintiff protected by the the 4th  and 14th Amendments of the Constitution.

## FOURTEENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 et seq. ("Canton Liability")

111. Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

112. Plaintiff alleges that Defendants acting in their official capacity were deliberately indifferent to the Constitutional rights of Plaintiff.  Plaintiff alleges Defendants were improperly trained in in how to carry out their duties without violating civil rights, despite having ample opportunity and resources to be so trained, and having received many complaints from the public about same. This failure to be properly trained, despite posessing ample opportunity, resources, and notification, reflected a conscious choice amounting to a de facto policy of the agencies employing Defendants.

## FIFTEENTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

113. Plaintiff realleges and incorporates all paragraphs from 1 to 83 inclusive.

114.  Plaintiff alleges Defendants acted with negligence, thereby subjecting him to infliction of emotional distress, with this Court having supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief as follows:

115.  A permanent injunction ordering the State of Arizona to recover and return all of Plaintiff's property and monies to Plaintiff, with interest calculated pursuant to 28 U.S. Code § 1961.

116.  An award in favor of Plaintiff against each Defendant individually, and all Defendants jointly and severally, for damages sustained as a result of Defendants' negligence and intentional acts, with such award including consequental, punitive, and incidental damages, fees and costs, in an amount totalling $2 million dollars, or such amount as shall be established at trial.

117.  In the interests of justice, this Court shall order appointment of counsel for Plaintiff pursuant to 28 U.S.C. §1915(e)(1).

118.  Declatory relief stating that Plaintiff has been "injured or aggrieved by the wrongful act or default of the officer in his official capacity" by

Defendants individually and collectively within the meaning of Arizona Revised Statutes § 38-260.

119.  Declatory relief stating that Plaintiff is a "person so injured or aggrieved" by Defendants individually and collectively within the meaning of Arizona Revised Statutes § 38-260.

120.  Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), plaintiff Eric Gerow hereby demands a trial by jury on all issues so triable by a jury in this action.

DATED this 26th day of December 2022

Respectfully submitted,

Eric Gerow, In Propria Persona

3432 US-19 #6, Holiday, FL 34691

Tel. 917-648-4710

Email: arzo101@protonmail.com

Signed:

34